**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **CENTER FOR BIOLOGICAL** ) | |
| **DIVERSITY**, a nonprofit corporation, ) | |
| 1333 N. Oracle Rd. ) | |
| Tucson, AZ 85705 ) | **Case No:** |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | |
| **KEN SALAZAR**, United States Secretary of ) | |
| the Interior ) | |
| 1849 C Street, N.W. ) | |
| Washington, D.C.  20240 ) | |
| ) | |
| **DEPARTMENT OF INTERIOR** ) | |
| 1849 C Street, N.W. ) | |
| Washington, D.C.  20240 ) | |
| ) | |
| **BUREAU OF OCEAN ENERGY** ) | |
| **MANAGEMENT, REGULATION AND** ) | |
| **ENFORCEMENT** ) | |
| 1849 C Street, N.W. ) | |
| Washington, D.C.  20240 ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1.      In this civil action for declaratory and injunctive relief, Plaintiff CENTER FOR

BIOLOGICAL DIVERSITY ("the Center") challenges the failure of Defendants KEN

SALAZAR, United States Secretary of the Interior, the DEPARTMENT OF INTERIOR, and

the BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND

ENFORCEMENT (collectively "the Secretary") to comply with the National Environmental Policy Act, 42 U.S.C. § 4321-4347 ("NEPA") when deciding to lift the Secretary's July 12, 2010 suspension on deepwater drilling. Secretary of the Interior, Decision Memorandum Re: Termination of the suspension of certain offshore permitting and drilling activities on the Outer Continental Shelf (Oct. 12, 2010).

2.      On October 12, 2010, the Secretary lifted the moratorium and determined that deepwater drilling has no significant effects on the human environment. *Id*. at 2. In the aftermath of the worst oil spill in American history this determination was arbitrary and capricious because drilling clearly can and does have significant impacts on wildlife and the environment. Moreover, the Secretary has not cured serious underlying problems that contributed to the April 20, 2010 blowout of the *Deepwater Horizon* drill rig, and massive oil spill, namely, excluding drilling plans from environmental review. Therefore, the Secretary is repeating the same errors in allowing risky drilling to proceed without analyzing the significant environmental effects.

3.      The *Deepwater Horizon* blowout and oil spill demonstrate that large-magnitude oil spills may result from offshore oil drilling. The ruptured well spewed nearly 5 million barrels of oil into the Gulf of Mexico, oiled over 500 miles of coastline, and killed thousands of seabirds, marine mammals, and other wildlife, including threatened and endangered species.

4.      The Center challenges the Secretary's decision to lift the deepwater drilling moratorium without the preparation of an Environmental Impact Statement ("EIS"). Moreover, the failure of the Secretary to provide the public with relevant environmental information on the effects of commencing drilling violates NEPA's requirements.

5.      The Center seeks an order setting aside the Secretary's unlawful decision, thus reinstating the moratorium on deepwater drilling, and requiring the Secretary to conduct full and adequate analysis of the environmental impacts stemming from his decision to lift the suspension of deepwater drilling. Such an order is necessary to afford the sensitive species and ecosystems of the Gulf, as well as the individuals and communities dependant on those

resources, the procedural and substantive protections to which they are lawfully entitled and, in light of the massive oil spill, so desperately need.

## II. JURISDICTION AND VENUE

6.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy); and 5 U.S.C. §§ 702-706 (Administrative Procedure Act).

7.     Venue is proper in this court because Defendants reside in this district. 28 U.S.C. § 1391(e).

## III. PARTIES

8.     The Center is a nonprofit corporation that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is dedicated to the preservation, protection, and restoration of biodiversity and ecosystems. Center members, staff, and board members include people with aesthetic, professional, recreational, spiritual, educational, scientific, moral, and conservation interests in the species and habitats of the Gulf of Mexico that have been, and unless the relief sought in this Complaint is granted, will continue to be harmed by Defendants' actions and inactions. The Center brings this suit on its own behalf and on behalf of its adversely affected members, staff, and board.

9.     The Center has 42,000 members, including over 3,500 members in the Gulf of Mexico region. Center members reside near, travel to, and recreate in the marine and coastal waters, marshes and beaches of the Gulf of Mexico. The Center's members use the Gulf of Mexico for wildlife observation, research, nature photography, aesthetic enjoyment, recreational, educational, and other activities. The Center's members have concrete plans to continue these activities. Moreover, to ensure that these species and ecosystems continue to exist, the Center, its members, staff, and board work to protect and preserve the habitats necessary for survival and recovery of these species and ecosystems. Therefore, not only do the Center's members, staff,

and board have strong aesthetic, recreational, moral and spiritual interests in the species and ecosystems of the Gulf, they also have strong professional, conservationist, educational, and scientific interests in them as well.

10.    The Center, its members, staff, and board suffer procedural and informational injuries flowing from the Secretary's failure to comply with NEPA. The Secretary's failure to prepare an EIS on the decision to lift the moratorium that is the subject of this Complaint deprives the Center, its members, staff, and board of information and a process to which they are statutorily entitled. The Secretary's continued violation of the procedural mandates of NEPA when lifting the moratorium not only harms the procedural interest of the Center and its members, but also has harmed and threatens future harm to the concrete interests the Center, its members, staff, and board have in the fish, wildlife and ecosystems of the Gulf of Mexico.

11.    In sum, unless this Court grants the requested relief and orders the Secretary to comply with NEPA, statutorily required information will not be made available, required public participation procedures will not be initiated, listed species and their critical habitats will continue to be exposed to further harm, and the aesthetic, recreational, educational, professional, scientific, spiritual, moral, and conservation interests of the Center, its members, its staff, and its board will continue to be adversely affected. If the Secretary had complied with NEPA before allowing drilling to resume, he may have chosen not to lift the moratorium or required measures that better protect the Gulf environment, in which the Center and its members have an interest. The injuries to the Center, its members, and staff would be redressed by declaratory and injunctive relief compelling the Secretary to comply with NEPA procedures before lifting the moratorium on deepwater drilling. The Center has no other adequate remedy at law.

12.    Defendant KEN SALAZAR, United States Secretary of the Interior, is the highest ranking official within the Department of the Interior and, in that capacity, took the action to lift the moratorium on deepwater drilling. The Secretary has ultimate responsibility for the administration and implementation of offshore oil drilling activities that are the subject of this

Complaint, and for compliance with all other federal laws applicable to the Department of the Interior, including NEPA. He is sued in his official capacity.

13.     Defendant DEPARTMENT OF INTERIOR is an agency required by law to manage and oversee the leasing and development of oil and gas resources in the outer continental shelf, to protect the fish, wildlife and other resources of the outer continental shelf when carrying out such activities, and to comply with other applicable laws, such as NEPA.

14.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT is an agency within the Department of Interior authorized and required by law to manage and oversee the leasing and development of oil and gas resources in the outer continental shelf, to protect the fish, wildlife and other resources of the outer continental shelf when carrying out such activities, and to comply with other applicable laws, such as NEPA. The Bureau of Ocean Energy Management, Regulation and Enforcement prepared the Environmental Assessment that is the subject of this action and may correct the violations described herein.

## IV. STATUTORY BACKGROUND

### A.     The Outer Continental Shelf Lands Act

15.     In 1953, Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") to authorize federal leasing of the outer continental shelf ("OCS") for oil and gas development in federal waters. In 1978, Congress amended OCSLA (Pub. L. No. 95-372, 92 Stat. 629) to provide, in part, for the development of resources on the OCS "subject to environmental safeguards." 43 U.S.C. § 1332(3).

16.     OCSLA, as amended, establishes four distinct stages for oil and gas development activities on the OCS: (1) the development of a five-year leasing plan; (2) issuance of oil and gas leases; (3) approval of lessee's exploration plans; and (4) approval of lessee's development and production plans. 43 U.S.C. §§ 1331-1356a.

### B.     The National Environmental Policy Act

17.     The goal of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.  NEPA's fundamental purposes are to guarantee that: (1)

agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency has, and carefully considers, detailed information concerning significant environmental impacts; and (2) agencies make the relevant information available to the public so that it may also play a role in both the decision-making process and the implementation of that decision. *See, e.g.,* 40 C.F.R. § 1500.1.

18.    NEPA and the regulations promulgated there under by the Council on Environmental Quality ("CEQ") require that federal agencies, including the Secretary, must prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

19.    An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C).

20.    An EIS must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  NEPA also requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7, 1508.8. Cumulative impacts include the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future significant actions." 40 C.F.R. § 1508.7.  Direct effects are caused by the action and occur at the same time and place. *See id.* § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. *See id.* § 1508.8(b). Both include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social, or health" effects. *Id.*

21.     In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action. 40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

22.     Throughout the NEPA process, the agency is required to "insure the professional integrity, including scientific integrity," of its discussions and analyses. *Id.* § 1502.24.

23.     An agency may first prepare a detailed Environmental Assessment to determine whether the project may significantly affect the environment and thus requires preparation of a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. If any significant environmental impact might result from an agency's actions, an EIS is required. 40 C.F.R. § 1501.4.

24.     Whether there is a significant effect requires the consideration of "context" and "intensity." 40 C.F.R. § 1508.27. Many factors should be considered under intensity, including effects on threatened or endangered species, unique geographic characteristics, cumulative impacts, controversial effects, uncertain or unique risks, loss of cultural resources. *Id.* An action may be significant if any one of these factors is met.

25.     If an EIS is not required, the federal agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9, 1508.13.

## V. FACTUAL AND PROCEDURAL BACKGROUND

26.     On April 20, 2010 BP's *Deepwater Horizon* drilling rig exploded, killing 11 workers, and gushing nearly 5,000,000 barrels of oil into the Gulf of Mexico. The oil spill was the largest in U.S. history and the worst environmental disaster this nation has ever faced. The President, *Long-Term Gulf Coast Restoration Support Plan: Memorandum for the Heads of Executive Departments and Agencies*, 75 Fed. Reg. 38,913 (July 6, 2010).

27.     The oil spill resulted in intense public controversy over the safety and environmental consequences of offshore oil and gas drilling. It garnered worldwide mass media

attention, Congressional hearings, federal investigations, and a moratorium on deepwater drilling.

28.     The oil spill had and will continue to have significant environmental impacts on the Gulf of Mexico. According to government figures, over 6,000 oiled birds died and hundreds of dead sea turtles and marine mammals have been collected in the Gulf of Mexico. Among the wildlife toll were endangered sea turtles, piping plover, and other federally and state protected species.

29.     Baseline environmental conditions in the Gulf of Mexico have been altered by the oil spill. Marine animals, such as sperm whales, sea turtles, birds and fish have been exposed to the oil and dispersants in the massive spill area. Exposure to these chemicals can impair behavior, respiratory functions, reproduction, food availability, and digestion. Moreover, toxic persistent compounds in the oil remain in the environment and accumulate in the food chain. Significant impacts on the environment will continue for years to come.

30.     On May 28, 2010, the Secretary of the Interior issued a sixth-month moratorium on deepwater drilling operations. The moratorium was based on the Secretary's determination that "under current conditions, offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment" and that "the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment." This moratorium was later enjoined and rescinded.

31.     On July 12, 2010, the Secretary issued a new moratorium that concluded that it was necessary to suspend certain drilling activities until November 30, 2010, subject to modification, because of "a threat of serious, irreparable, or immediate harm or damage" to human or animal "life . . . or the marine, coastal, or human environment."

32.     On August 16, 2010, the Council on Environmental Quality released a report on the Secretary's compliance with NEPA and OCSLA using the permitting process for the *Deepwater Horizon* drilling as a case study for analyzing how the Secretary implements NEPA.

In light of the *Deepwater Horizon* disaster and its lack of environmental analysis, the report recommended that the Secretary revise his NEPA policies that apply to offshore oil and gas activities. The Secretary has not completed new rulemaking to revise those NEPA policies.

33.     On October 12, 2010, the Secretary issued his decision to lift the drilling moratorium, thus allowing the suspended deepwater drilling activities to resume. The Secretary lifted the drilling moratorium relying in part on an internal Environmental Assessment. The suspension applied to 36 deepwater drilling operations and 12 deepwater drilling operations that are pending approval.

34.     The Secretary's decision to lift the moratorium on deepwater drilling constitutes a major federal action as defined under NEPA. 40 C.F.R. § 1508.18.  Therefore, the Secretary was required to comply with NEPA's duty to "[i]nclude in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement" which addresses, inter alia, the environmental impact of the proposed action. 42 U.S.C. § 4332(C).

35.     The Environmental Assessment relies, in part, on prior EISs for the Gulf of Mexico OCS leasing program, which are presently being supplemented in light of the *Deepwater Horizon* oil spill.

36.     The Environmental Assessment states that a catastrophic spill with relatively large-scale and long-duration effects is still a possibility, and the effects of such a spill would be significant. It also acknowledges that a spill would have significant impacts on marine and coastal biological habitats, as well as individual species, including direct impacts on threatened or endangered species.

37.     The Environmental Assessment narrowed the scope of the proposed action to evaluate only the impacts of seven weeks between when the Secretary lifted the moratorium and November 30, 2010. The analysis determined that the action would not appreciably change the risks of a catastrophic oil spill.

38.     The Secretary concluded that his action lifting the moratorium would not have a significant impact on the human environment – called a Finding of No Significant Impact.

39.     Upon information and belief, the Secretary did *not* give the public *prior* notice of the Environmental Assessment, did not make the information available to the public, and did not accept public comment.

## VI. VIOLATIONS

40.     The Secretary's decision to lift the deepwater drilling moratorium allows deepwater drilling to resume even though the significant environmental impacts of offshore oil drilling on the human environment have still not been adequately analyzed, in violation of NEPA. The Secretary's failure to prepare an EIS violates NEPA. The Secretary's decision also impermissibly relies on programmatic EISs for the Gulf of Mexico program that admittedly require supplementation. Meanwhile, the risk of another major spill is heightened and remains so until supplemental NEPA analyses are complete.

41.     The Environmental Assessment concedes deepwater drilling activities can result in significant environmental impacts, including adverse effects on endangered species, sensitive habitats, and have controversial effects. A Finding of No Significant Impact for deepwater drilling activities is irrational after the *Deepwater Horizon* oil spill.  The Secretary's decision that there are no significant environmental effects from his decision to lift the drilling moratorium is completely untenable and must be declared arbitrary and capricious and set aside.

42.     The Environmental Assessment relied upon by the Secretary was inadequate and violates NEPA. Specifically, the Environmental Assessment failed to take a hard look at the environmental consequences of lifting the drilling suspensions. The Secretary also failed to consider the relevant factors in his decision to lift the deepwater drilling moratorium and in preparing his Environmental Assessment.  Admitting that significant environmental effects are possible, but ignoring those effects because there is a low potential for a catastrophic oil spill, is arbitrary and capricious.

43.     The scope of the analysis in the Environmental Assessment is impermissibly narrowed. At minimum, the Secretary should have considered the impacts of reasonably foreseeable future drilling operations resulting from ending the suspension on deepwater drilling. The Secretary also failed to consider the cumulative and indirect impacts of his actions in violation of NEPA.

44.     The Secretary's failure to include and inform the public in NEPA's decisionmaking process violates NEPA's requirement that agencies make the relevant information available to the public so that it may also play a role in both the decision-making process and the implementation of the proposed activity. *See, e.g.,* 40 C.F.R. § 1500.1. In the aftermath of the worst environmental disaster in American history it is arbitrary and capricious and in violation of NEPA for the Secretary to withhold from public notice, comment, and review the Environmental Assessment *prior* to making his decision.

## VII. CLAIMS FOR RELIEF

45.     The Center realleges and incorporates by reference all the allegations set forth in this Complaint, as though fully set forth below.

46.     The Secretary's October 12, 2010 decision to lift the suspension on deepwater drilling is arbitrary and capricious, an abuse of discretion, not in accordance with law, and fails to observe proper procedure under the Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review thereunder.

47.     The Secretary's failure to prepare an EIS on his action lifting the deepwater drilling moratorium violates NEPA, 42 U.S.C. §§ 4321-4347, the regulations promulgated by CEQ, 40 C.F.R. §§ 1500.1-1500.6, and the Secretary's own NEPA regulations, 43 C.F.R. §§ 46.10-46.450.  For instance, the lifting of the moratorium affects public health and safety, impacts unique characteristics of the Gulf of Mexico, is highly controversial, involves unique and unknown risks, establishes a precedent for future actions with significant effects, will result in cumulatively significant impacts, and will adversely affect threatened and endangered species, all requiring an EIS.  40 C.F.R. § 1508.27(b).  The Secretary's decision to lift the deepwater

drilling moratorium is thus arbitrary and capricious, an abuse of discretion, not in accordance with law, and fails to observe proper procedure under the Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review thereunder.

48.     The Secretary's Environmental Assessment is inadequate and violates NEPA, 42 U.S.C. §§ 4321-4347, the regulations promulgated by CEQ, 40 C.F.R. §§ 1500.1-1500.6, and the Secretary's own NEPA regulations, 43 C.F.R. §§ 46.10-46.450.  The Secretary failed to consider relevant factors and environmental information, and he failed to take a hard look at the environmental consequences of his actions, including consideration of cumulative and indirect effects. Such action and inaction is arbitrary and capricious, an abuse of discretion, not in accordance with law, and fails to observe proper procedure under the Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review thereunder.

49.     The Secretary's failure to involve or even inform the public about an agency's preparation of an Environmental Assessment and a Finding of No Significant Impact, as was the case here, violates NEPA, 42 U.S.C. §§ 4321-4347, the regulations promulgated by CEQ, 40 C.F.R. §§ 1500.1-1500.6, and the Secretary's own NEPA regulations, 43 C.F.R. §§ 46.10-46.450.  For instance, the Secretary failed to meaningfully involve the public before decisionmaking, *see* 40 C.F.R. § 1500.1(b), failed to involve the public to the extent practicable in preparing the Environmental Assessment, 40 C.F.R. § 1501.4(b), failed to make diligent efforts to involve the public in implementing its NEPA procedures, 40 C.F.R. § 1506.6(a), failed to provide public notice of the availability of the Environmental Assessment and solicit appropriate environmental information from the public, 40 C.F.R. § 1506.6(b,d), and failed to make the Finding of No Significant Impact available for public review for 30 days prior to the final determination of whether to prepare an EIS even though the proposed action is clearly one that normally requires an EIS and is without precedent, 40 C.F.R. § 1501.4(e).  The Secretary's decision to lift the deepwater drilling moratorium is thus arbitrary and capricious, an abuse of discretion, not in accordance with law, fails to observe proper procedure under the

Administrative Procedures Act, 5 U.S.C. §§ 701-706, and is subject to judicial review thereunder.

## VIII.   PRAYER FOR RELIEF

For the reasons stated above, the Center respectfully requests that the Court grant the following relief.

1.      Declare that the Secretary is in violation of NEPA and the APA for lifting the moratorium on deepwater drilling;

2.      Declare that the Secretary is in violation of NEPA and the APA for failing to prepare an EIS;

3.      Declare that the Secretary is in violation of NEPA and the APA for failing to make the Environmental Assessment information available to the public and allow public participation;

4.      Declare that the Secretary is in violation of NEPA and the APA for failing to consider relevant environmental information when concluding that lifting the moratorium would have no significant effect;

5.      Issue permanent injunctive relief compelling the Secretary to set aside his decision to lift the deepwater drilling moratorium until he complies with NEPA by preparing an EIS;

6.      Award the Center its costs of litigation, including reasonable attorneys fees under the Equal Access to Justice Act; and

7.      Grant the Center such other relief as the Court deems just and proper.

DATED: October 22, 2010.

_____

William J. Snape, III (DC Bar # 455266)
CENTER FOR BIOLOGICAL DIVERSITY
5268 Watson Street, NW
Washington, DC 20016
Ph: 202-537-3458/202-536-9351
Fax: 415-436-9683
billsnape@earthlink.net

COMPLAINT FOR DECLARATORY
 & INJUNTIVE RELIEF

13

Miyoko Sakashita (*Pro hac vice* application pending)
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Ph: 415-436-9682
Fax: 415-436-9683
miyoko@biologicaldiversity.org

Attorneys for Center for Biological Diversity